Carroll
No. 2007-173

JOHN MALONEY, ADMINISTRATOR OF THE ESTATE OF HELENE MALONEY

v.

DENNIS S. BADMAN, M.D. *& a.*

Argued: November 13, 2007
Opinion Issued: December 20, 2007

*Burns, Bryant, Cox, Rockefeller & Durkin, P.A.*, of Dover (*John E. Durkin* on the brief and orally), for the plaintiff.

*Sulloway & Hollis, P.L.L.C.*, of Concord (*W. Kirk Abbott, Jr.* and *Sarah S. Murdough* on the brief, and *Mr. Abbott* orally), for the defendants.

DALIANIS, J. The plaintiff, John Maloney, administrator of the estate of Helene Maloney, appeals the order of the Superior Court (*O'Neill*, J.) granting summary judgment to defendant Dennis S. Badman, M.D. on the plaintiff's negligence action for wrongful death. The defendants, Badman and his business, Wakefield Family Medicine, cross-appeal from the trial court's finding that Badman rendered substandard care and its ruling that he is judicially estopped by statements in his settlement agreement with the New Hampshire Board of Medicine (board). We affirm.

*I. Background*

The trial court's orders recited the following: The decedent, Helene Maloney, was the plaintiff's wife. She committed suicide on July 18, 2001. She died from an intentional overdose of Percocet. The day before she died, the decedent checked into a motel using an alias. On July 18, 2001, in response to a call from the motel's owner, the police found the decedent in her hotel room. They also found a suicide note, a check from the decedent to the plaintiff, and five prescription pill bottles, three of which were empty, two of which were partially full.

Throughout the decedent's life, she suffered from Crohn's disease, which is a chronic intestinal illness, as well as depression and suicidal ideation. She treated the major aspects of her Crohn's disease with a specialist in Boston. The decedent also saw several local doctors, including Badman, for treatment of her Crohn's disease and as primary care physicians.

The decedent saw Badman twice in the spring of 1999 and seven times in 2001. In the course of treating her, he prescribed Percocet and Valium. Badman never saw or treated the decedent in a hospital, nor did he prescribe any medications to her in 2000. Pharmacy records show that the decedent received prescriptions from Dr. John Patten for Percocet in June and October 2000. The prescription of one of the empty bottles found in her hotel room was filled in October 2000.

Additionally, the decedent received treatment from a psychiatrist. Badman was informed about the decedent's visits with her psychiatrist; specifically, he was notified that she had become severely depressed after her ileostomy and bowel resection nine years earlier, had lost weight, was house-bound for two years, was in pain, exhausted, and malnourished, and felt deformed and hopeless. He was also notified that the decedent was struggling with mood regulation and that she considered suicide a possibility in the future should she again become racked with pain due to her Crohn's disease.

Following the decedent's death, the board investigated Badman. Ultimately, the board and Badman entered into a settlement agreement

pursuant to which the board reprimanded him and, among other things, restricted his license to prescribe certain drugs. In this agreement, Badman admitted to prescribing medications to the decedent without office visits. He also admitted that, in treating the decedent, he failed to: perform proper physical examinations, conduct an objective assessment of her need for drugs, and document his clinical decisions adequately.

The plaintiff's expert testified at his deposition that he believed that the decedent had accelerated depression and that, because of this, Badman erred when he prescribed Valium to her, as this drug worsens depression. The expert concluded that Badman provided the decedent with substandard care for her chronic pain, which contributed to her depression, and led to her suicide.

After the decedent died, the plaintiff brought the instant wrongful death action against the defendants, alleging that Badman's negligence had proximately caused the decedent's suicide. Badman moved for summary judgment on the ground that he was not liable for the decedent's suicide because he had no pre-existing duty to prevent it. The trial court ruled in his favor, and this appeal followed.

## II. Analysis

### A. Standard of Review

We will affirm a trial court's grant of summary judgment if, considering the evidence and all inferences properly drawn therefrom in the light most favorable to the non-movant, our review of that evidence discloses no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Stewart v. Bader*, 154 N.H. 75, 87 (2006). We review the trial court's application of the law to the facts *de novo*. *Id.*

### B. General Legal Principles

To prevail upon his negligence claim, the plaintiff must demonstrate that Badman owed the decedent a duty, breached that duty and that the breach proximately caused the decedent's suicide. *See Dupont v. Aavid Thermal Technologies*, 147 N.H. 706, 709 (2002). Whether a defendant owes a duty is a question of law. *Sintros v. Hamon*, 148 N.H. 478, 480 (2002). "Absent a duty, there is no negligence." *Walls v. Oxford Management Co.*, 137 N.H. 653, 656 (1993).

■ Generally, "negligence actions seeking damages for the suicide of another will not lie because the act of suicide is considered a deliberate, intentional and intervening act which precludes a finding that a given defendant, in fact, is responsible for the harm." *McLaughlin v. Sullivan*, 123 N.H. 335, 337 (1983); *see* WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY 2286 (unabridged ed. 2002) (suicide is "the act . . . of taking one's own life voluntarily and intentionally"); *cf. Cole v. Combined Ins. Co. of America*, 125 N.H. 395, 396 (1984) (definition of suicide as deliberate and intentional "implies that one who commits suicide . . . must understand the natural physical consequences of his act to produce death and must have the capacity to choose effectively to do or not to do the act"). "This is because the act of suicide breaks the causal connection between the wrongful or negligent act and the death." *Bruzga v. PMR Architects*, 141 N.H. 756, 757-58 (1997) (quotation omitted).

■ Other jurisdictions have recognized two exceptions to this general rule. *Id.* at 758. Under one exception, liability exists because the defendant actually caused the suicide; under the other, liability exists because the defendant had a duty to prevent it. *McLaughlin*, 123 N.H. at 337.

■ In *McLaughlin*, we explained the first exception as follows:

> The first exception involves cases where a tortious act is found to have caused a mental condition in the decedent that proximately resulted in an uncontrollable impulse to commit suicide, or prevented the decedent from realizing the nature of his act. Such cases typically involve the infliction of severe physical injury, or, in rare cases, the intentional infliction of severe mental or emotional injury through wrongful accusation, false arrest or torture.
>
> This exception also encompasses cases in which a statute prohibiting the sale of certain drugs or liquor was violated by the defendant. In these cases, liability arises both by virtue of direct causation (the drugs or alcohol foreseeably caused a frenzy or uncontrollable impulse to commit suicide), and also out of a breach of what is described as a duty to refrain from knowingly making available the actual means of an individual's self-destruction.

*Id.* at 337-38 (citations omitted); *see* RESTATEMENT (SECOND) OF TORTS § 455, at 493 (1965) (if actor's negligent conduct brings about delirium or insanity of another, actor is liable for harm done by other to himself while delirious or insane if delirium or insanity prevent him from realizing nature of act or makes it impossible for him to resist impulse caused by insanity). We adopted part of this exception in *Mayer v. Town of Hampton*, 127 N.H. 81, 87 (1985), holding that:

> in order for a cause of action for wrongful death by suicide to lie for intentional torts, the plaintiff must demonstrate that the

tortfeasor, by extreme and outrageous conduct, intentionally wronged a victim and that this intentional conduct caused severe emotional distress in his victim which was a substantial factor in bringing about the suicide of the victim.

We described the second exception in *McLaughlin* as follows:

> The second exception focuses on the existence of a specific duty of care to prevent suicide. This duty has been imposed as a matter of law, on essentially two classes of defendants, both of whom are held to have a special relationship with the suicidal individual. The typical defendant in such cases is someone who has a duty of custodial care, is in a position to know about suicide potential, and fails to take measures to prevent suicide from occurring. Specifically, this duty has been imposed on: (1) institutions such as jails, hospitals and reform schools, having actual physical custody of and control over persons; and (2) persons or institutions such as mental hospitals, psychiatrists and other mental-health trained professionals, deemed to have a special training and expertise enabling them to detect mental illness and/or the potential for suicide, and which have the power or control necessary to prevent that suicide.

*McLaughlin*, 123 N.H. at 338 (quotation and citations omitted); *see* RESTATEMENT (SECOND) OF TORTS, *supra* § 314A at 118 ("One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."); *see also* RESTATEMENT (SECOND) OF TORTS, *supra* comment *d* at 119 ("The duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct."). We adopted this exception as it pertains to jailers in *Murdock v. City of Keene*, 137 N.H. 70, 72-73 (1993), where we held that a jailer could not be liable under a negligence theory, but could be liable if his or her reckless conduct proximately caused the prisoner's injuries from an attempted suicide.

Although we have not yet adopted the other parts of the first exception or the second exception as it pertains to physicians, at oral argument, the parties informed the court that they did not want the court to depart from its dicta in *McLaughlin*. Therefore, because the parties have not asked us to do otherwise, we will assume, without deciding, that New Hampshire law recognizes the other parts of the first exception and the second exception as it pertains to physicians, and that our dicta in *McLaughlin* controls.

## C. Plaintiff's Arguments

### 1. First Exception

The plaintiff first argues that Badman's conduct falls within the first exception to the general rule that there is no tort liability for the suicide of another. Relying upon our observation in *McLaughlin*, 123 N.H. at 338, that this exception "encompasses cases in which a statute prohibiting the sale of certain drugs or liquor was violated by the defendant," he contends that it applies because Badman's May 2001 Percocet prescriptions to the decedent allegedly violated RSA 318-B:9, V (2004) and that with these prescriptions, Badman knowingly made available the means of the decedent's self-destruction. According to Badman's affidavit, on May 10, 2001, he prescribed "Percocet 7.5-500 mg, 100 pills" to the decedent and prescribed "Percocet 7.5-500 mg, 540 pills" to be filled by a mail-in prescription service. Although the plaintiff asserts that these prescriptions also violated federal law, the federal statutes he cites pertain to pharmacists, not physicians.

As a preliminary matter, although the defendants contend that the plaintiff did not preserve this argument for our review, we disagree. This argument appears in the plaintiff's objection to the defendants' motion for summary judgment. *See In the Matter of Hampers & Hampers*, 154 N.H. 275, 290-91 (2006). We also disagree with the defendants that the plaintiff failed to develop his argument sufficiently for the trial court's review. *See id.* at 291-92. Although the trial court did not discuss the first exception in its order, we assume that it made all subsidiary findings necessary to support its ruling. *See Nordic Inn Condo. Owners' Assoc. v. Ventullo*, 151 N.H. 571, 586 (2004).

With respect to the merits of the plaintiff's argument, even if we assume that our dicta in *McLaughlin* about the first exception survived our decision in *Mayer*, our review of the evidence in the light most favorable to the plaintiff discloses no genuine issue of material fact as to whether the first exception applies to Badman.

In *McLaughlin*, we stated that liability where a defendant sells certain drugs or liquor "arises both by virtue of direct causation (the drugs or alcohol foreseeably caused a frenzy or uncontrollable impulse to commit suicide), and also out of a breach of what is described as a duty to refrain from knowingly making available the actual means of an individual's self-destruction." *McLaughlin*, 123 N.H. at 338. We mentioned dram shop acts and acts regulating the sale of narcotics by pharmacists as examples of statutes under which liability is imposed. *Id.*

With respect to pharmacist liability, "[m]ost of the courts considering the . . . question have found no liability, reasoning that the act of the

decedent in voluntarily ingesting the poison, with knowledge of its effect, amounts to a new and intervening proximate cause, insulating the effect of any negligence on the druggist's part." Annotation, *Druggist's Civil Liability for Suicide Consummated with Drugs Furnished by Him*, 58 A.L.R.3d 828, 828 (1974); *see Runyon v. Reid*, 510 P.2d 943, 949-50 (Okla. 1973). Liability may be imposed, if at all, only when the pharmacist (or seller of the instrumentality used by the decedent to commit suicide) had reason to expect that the drugs (or instrumentality) would be used to commit suicide. *See Drake v. Wal-Mart, Inc.*, 876 P.2d 738, 740-42 (Okla. Ct. App.), *cert. denied* (Okla. 1994); *Rains v. Bend of the River*, 124 S.W.3d 580, 594-96 (Tenn. Ct. App. 2003) (defendant who sold ammunition to decedent was not liable for decedent's suicide absent evidence that it knew or should have known that decedent intended to use ammunition to commit suicide). Similarly, liability for suicide under dram shop laws is also predicated upon foreseeability. *See Kirman Rd. Sports Pub & Rest. v. Dempsey*, 723 So. 2d 384 (Fla. Dist. Ct. App. 1998).

■ Viewing the evidence in the light most favorable to the plaintiff, we conclude that it does not raise a genuine issue of material fact as to whether Badman knew or should have had reason to expect that the decedent would use Percocet to commit suicide. Put another way, the evidence, viewed in the light most favorable to the plaintiff, fails to raise a genuine issue of material fact as to whether the decedent's suicide was or should have been foreseeable to Badman.

It is undisputed that the decedent and Badman had no contact after May 2001, two months before she committed suicide. There is no evidence that the decedent expressed suicidal ideation to Badman when they had contact in May 2001. Although Badman was told that the decedent became depressed eight years before she first saw him and that she held open the possibility of suicide if she became racked with pain, he was also told that she had no current suicidal ideation or plan. It is also undisputed that the decedent failed to tell Badman that she attempted suicide in 1987. Further, there is no evidence that the decedent's family ever expressed the view to Badman that the decedent was suicidal. Moreover, the plaintiff's expert testified at his deposition that, according to records he reviewed, the decedent saw a mental health provider on four occasions during the week before she died and was not assessed to be suicidal. The provider noted that the decedent neither intended nor planned to commit suicide. Viewing this evidence in the light most favorable to the plaintiff, we hold that it is insufficient to raise a triable issue of fact as to whether it was or should have been foreseeable to Badman that the decedent would commit suicide. *See Lawlor v. Orlando*, 795 So. 2d 147, 148 (Fla. Dist. Ct. App. 2001)

(suicide not foreseeable where decedent "showed no indication of suicidal tendencies; there is no evidence of suicide attempts, threats of suicide, nor any mention of suicide; and a suicide screening done in connection with [his] brief incarceration only a few months prior to his suicide revealed no risk of suicide").

The plaintiff mistakenly relies upon *Edwards v. Tardif*, 692 A.2d 1266 (Conn. 1997), which is distinguishable on its facts. The defendant in *Edwards* treated the decedent for "recurring clinical depression." *Edwards*, 692 A.2d at 1268. Here, Badman treated the decedent for Crohn's disease. In *Edwards*, the decedent took her own life only eight days after her last contact with the defendant's office. *Id.* Here, the decedent committed suicide two months after her last contact with Badman.

For the above reasons, we hold that the trial court did not err when it granted summary judgment to Badman with respect to the first exception to the general rule of no tort liability for the suicide of another. To the extent that the plaintiff asserts that Badman's May 2001 prescriptions constituted negligence *per se*, the record shows that the plaintiff moved to amend his writ to add such a claim, which the trial court appears to have denied, and that he has not appealed that denial. Thus, we do not address any negligence *per se* claim that the plaintiff purports to argue on appeal.

### 2. Second Exception

The plaintiff next contends that Badman's conduct falls within the second exception to the general rule of no tort liability for the suicide of another. Specifically, he asserts that Badman had a duty to prevent the decedent's suicide because he had a special relationship to her. This relationship, the plaintiff contends, arose because Badman, as the decedent's primary care physician, had a "precise duty to care for her overall health and well-being," which included her mental health, and the "precise control" over medications prescribed to her.

■ Our review of the evidence in the light most favorable to the plaintiff fails to reveal a disputed issue of material fact as to whether Badman had the control necessary to prevent the decedent from committing suicide. "Even in the case of individual psychiatrists, commentators have suggested that imposing liability . . . is only appropriate if [the] patient is hospitalized at the time of the suicide, because a psychiatrist does not have *sufficient control* over the non-hospitalized patient to prevent his suicide." *McLaughlin*, 123 N.H. at 340 (quotation and brackets omitted). Courts in other jurisdictions have so held. *See King v. Smith*, 539 So. 2d 262, 264 (Ala. 1989) (given minimum personal contacts between psychiatrist and

patient and, particularly, fact that psychiatrist treated patient on out-patient basis, psychiatrist and patient lacked special relationship necessary to make psychiatrist liable for patient's subsequent suicide); *Nally v. Grace Com. Church of the Valley*, 763 P.2d 948, 956 (Cal. 1988) (recognizing that California Supreme Court has imposed a special relationship giving rise to a duty to exercise due care in order to prevent suicide only "in the limited context of hospital-patient relationships where the suicidal person died while under the care and custody of hospital physicians who were aware of the patient's unstable mental condition"), *cert. denied*, 490 U.S. 1007 (1989); *Winger v. Franciscan Medical Center*, 701 N.E.2d 813, 820 (Ill. App. Ct. 1998) (mental healthcare professional may be liable for patient's suicide where professional "has assumed the custody or control of an individual, be it for a voluntary or involuntary admission, so that it is treating the individual and has knowledge of his suicidal tendencies"), *appeal denied*, 712 N.E.2d 825 (Ill. 1999); *Runyon*, 510 P.2d at 947, 950 (physicians treating decedent in out-patient clinic lacked degree of control required to impose duty to prevent suicide). Here, it is undisputed that Badman treated the decedent on an out-patient basis and that his last contact with her was in May 2001, two months before she committed suicide. This evidence is insufficient, viewed in the light most favorable to the plaintiff, to create a genuine issue of material fact as to whether Badman had the degree of control necessary to create a duty to prevent the decedent's suicide.

Because we are assuming that our dicta in *McLaughlin* controls, we need not resolve in this appeal whether in another case we might hold that foreseeability alone creates a special relationship between a physician and patient sufficient to make the physician liable for the patient's suicide. We observe that courts in other jurisdictions are split on this issue. *Compare Edwards*, 692 A.2d at 1270, *with Nally*, 763 P.2d at 959 ("Mere foreseeability of the harm or knowledge of the danger, is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm."); *Lee v. Corregedore*, 925 P.2d 324, 337 (Haw. 1996) (foreseeability alone is insufficient to create a duty on the part of counselors at a state veterans' service office to prevent the suicide of their noncustodial clients).

Accordingly, for all of the above reasons, we hold that the trial court did not err when it granted Badman summary judgment with respect to the second exception to the general rule of no tort liability for the suicide of

another. In light of our decision, we need not address the parties' arguments with respect to the defendants' cross-appeal.

*Affirmed.*

BRODERICK, C.J., and DUGGAN, GALWAY and HICKS, JJ., concurred.