Rockingham
No. 2008-737

HEIDI L. MIKELL, ADMINSTRATOR OF THE ESTATE OF JOSHUA R. MARKIEWICZ

v.

SCHOOL ADMINISTRATIVE UNIT #33 & a.

Argued: March 18, 2009
Opinion Issued: May 15, 2009

*Cleveland, Waters & Bass, P.A.*, of Concord (*William B. Pribis* and *Lisa M. Blanchard* on the brief, and *Mr. Pribis* orally), for the plaintiff.

*Getman, Stacey, Schulthess & Steere, P.A.*, of Bedford (*Dona Feeney* on the joint brief and orally) for defendants, School Administrative Unit #33, Susan Allen, and Lindy L. Moule.

*McDonough & O'Shaughnessy*, of Manchester (*Robert Whaland* on the joint brief), for defendants, Susan Allen and Lindy L. Moule.

DUGGAN, J. The plaintiff, Heidi L. Mikell, as administrator of the estate of her son, Joshua R. Markiewicz, appeals an order of the Superior Court (*McHugh*, J.) dismissing her claims against the defendants, School Administrative Unit #33 (SAU #33), Susan Allen, and Lindy L. Moule. We affirm.

## I

The plaintiff alleges the following facts, which we accept as true for purposes of this appeal. In January 2005, Joshua Markiewicz was a seventh grade student attending the Iber Holmes Gove Middle School in Raymond, part of SAU #33. Joshua had had some difficulties in the school environment, and his teachers reported that he was learning disabled and had behavioral problems. The plaintiff disagreed, however, and believed this was an attempt to have Joshua removed from the school.

In November 2004, a teacher's aide overheard Joshua state that he "wanted to blow his brains out." The teacher's aide reported the statement to Moule, the school's guidance counselor, who in turn called the plaintiff. Although the plaintiff offered to pick Joshua up, Moule indicated that he was "okay now" and she would send him back to class. Without informing the plaintiff, Moule had Joshua sign a "contract for safety," but subsequently took no further action in regard to his suicide threat.

On January 18, 2005, Allen, a special education teacher, reported to the vice-principal that Joshua had referred to two mints on his desk as medicine. The plaintiff alleges Allen did so "falsely and knowingly" in an attempt to affect his disciplinary record, and winked at Joshua while reporting the incident as "an acknowledgement of her lie." The following day, January 19, Joshua was again reported to the vice-principal for tipping his desk in class, being rude, and calling a teacher, apparently not Allen, a "bitch." Joshua was suspended, and the plaintiff was called to pick him up. At that point, the plaintiff contemplated home schooling Joshua, as she had done at times in the past. She told this to the vice-principal, who agreed it was a good idea.

Upon arriving home, Joshua went immediately to his room without speaking to his mother. Soon after, the plaintiff left to bring Joshua's grandfather, who had accompanied her to the school, to his residence. When she returned, she found Joshua had hanged himself. Joshua left a suicide note, which, among other things, stated he was telling the truth about the disciplinary incident involving Allen.

The plaintiff subsequently brought an action against SAU #33, Moule and Allen, alleging negligence claims against SAU #33 and Moule, intentional infliction of emotional distress and wrongful death claims against Allen, and vicarious liability claims for both Moule and Allen against SAU

#33. The defendants moved to dismiss the claims against them. The trial court granted the motions. This appeal followed.

On appeal, the plaintiff argues that the trial court erred in dismissing her claims against SAU #33 and Moule because they owed Joshua a general and special duty to prevent his suicide and, further, that Moule had voluntarily assumed a duty to act reasonably to prevent his suicide. The plaintiff further contends that the trial court erred in concluding that Allen's conduct was not extreme and outrageous. She also argues that the trial court erred when it determined that the disciplinary incident on January 19 was the more likely cause of Joshua's decision than Allen's conduct on January 18.

In reviewing a motion to dismiss, our standard of review is whether the allegations are reasonably susceptible of a construction that would permit recovery. *McNamara v. Hersh*, 157 N.H. 72, 73 (2008). We assume the plaintiff's pleadings to be true and construe all reasonable inferences in the light most favorable to her. *Id.* We then engage in a threshold inquiry that tests the facts in her petition against the applicable law. *Id.* If the allegations constitute a basis for legal relief, we must hold that it was improper to grant the motion to dismiss. *Id.*

█ As a general rule, negligence actions seeking damages for the suicide of another will not lie because the act of suicide is considered to be a deliberate, intentional and intervening act, which precludes a finding that a given defendant is, in fact, responsible for the harm. *McLaughlin v. Sullivan*, 123 N.H. 335, 337 (1983). "This is because the act of suicide breaks the causal connection between the wrongful or negligent act and the death." *Bruzga v. PMR Architects*, 141 N.H. 756, 757-58 (1997) (quotation omitted). A number of jurisdictions, however, have recognized two exceptions to that general rule. *Id.* at 758. "Under one exception, liability exists because the defendant actually caused the suicide; under the other, liability exists because the defendant had a duty to prevent it." *Maloney v. Badman*, 156 N.H. 599, 603 (2007).

██ "The first exception involves cases where an intentionally tortious act is found to have caused a mental condition in the decedent that proximately resulted in an uncontrollable impulse to commit suicide, or prevented the decedent from realizing the nature of his act." *Id.* (quotation omitted). These cases "typically involve the infliction of severe physical injury, or, in rare cases, the intentional infliction of severe mental or emotional injury through wrongful accusation, false arrest or torture." *Id.* (quotation omitted). We adopted this exception in *Mayer v. Town of Hampton*, 127 N.H. 81, 87 (1985), holding:

> [F]or a cause of action for wrongful death by suicide to lie for intentional torts, the plaintiff must demonstrate that the tortfeasor, by extreme and outrageous conduct, intentionally wronged a victim and that this intentional conduct caused severe emotional distress in his victim which was a substantial factor in bringing about the suicide of the victim.

*Mayer*, 127 N.H. at 87.

■ The second exception recognizes a cause of action when "the defendant has a specific duty of care to prevent suicide, arising from the defendant's special relationship with the suicidal individual." *Bruzga*, 141 N.H. at 758 (quotations omitted). "The typical defendant in such cases is someone who has a duty of custodial care, is in a position to know about suicide potential, and fails to take measures to prevent suicide from occurring." *Maloney*, 156 N.H. at 604 (quotation omitted).

> Specifically, this duty has been imposed on: (1) institutions such as jails, hospitals and reform schools, having actual physical custody of and control over persons; and (2) persons or institutions such as mental hospitals, psychiatrists and other mental-health trained professionals, deemed to have a special training and expertise enabling them to detect mental illness and/or the potential for suicide, and which have the power or control necessary to prevent that suicide.

*Id.* (quotation omitted). The plaintiff raises claims under both exceptions. We address each in turn.

## II

With respect to the first exception, the plaintiff argues that Allen's false report of misconduct was extreme and outrageous, and that a reasonable fact finder could have determined Allen's conduct was a substantial cause of Joshua's suicide. The plaintiff also argues that the trial court inappropriately substituted its judgment rather than assuming the truth of the facts alleged. We disagree.

■ One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. *Morancy v. Morancy*, 134 N.H. 493, 496 (1991). As we discussed above, when an action for wrongful death by suicide lies as an intentional tort, the plaintiff has the burden to prove that the defendant intentionally engaged in extreme and outrageous conduct that caused

extreme emotional distress, and that this emotional distress was a substantial factor in bringing about the suicide. *Mayer*, 127 N.H. at 87. In determining whether conduct is extreme and outrageous, it is not enough that a person has "acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice.'" RESTATEMENT (SECOND) OF TORTS § 46 comment *d* at 73 (1965). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

■ ■ The plaintiff contends that Allen's actions were extreme and outrageous, as well as the substantial cause of Joshua's suicide, because Allen misused her position of authority over Joshua by making a false report of misconduct in an effort to affect his disciplinary record and eventually expel him from the school. We recognize that false accusations may be grounds for liability under an intentional infliction of emotional distress claim. *See McLaughlin*, 123 N.H. at 338. We also acknowledge that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position . . . which gives him actual or apparent authority over the other, or power to affect his interests." RESTATEMENT (SECOND) OF TORTS § 46 comment *e* at 74. We do not find, however, that the alleged false accusation at issue here, even coupled with Allen's position of authority, rises to the level of extreme and outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress.

As an initial matter, we note that the actual substance of the alleged false accusation, characterizing mints as medicine, was relatively innocuous. Other jurisdictions have found under far more egregious circumstances that a single false accusation could not support this type of claim. For example, in *Reardon v. Allegheny College*, 926 A.2d 477 (Pa. Super. Ct. 2007), Reardon brought a claim for intentional infliction of emotional distress, alleging that a professor and two co-students had "intentionally and wrongly targeted and accused [her] of violations of the college's honor code, despite their knowledge of the falsity of these allegations." *Reardon*, 926 A.2d at 488 (quotation omitted). Although the alleged false accusations resulted in, among other things, Reardon failing a class, being stripped of certain honors, and also being placed on academic probation for the remainder of her academic career, *id.* at 479, the court determined that these allegations, even if true, were not extreme and outrageous, and could not sustain her claim, *id.* at 488.

In *Woods v. St. Charles Parish School Board*, 790 So. 2d 696 (La. Ct. App. 2001), the mother of a first grader brought an action for damages alleging

that her son's school had engaged in a continuous campaign of harassment and false accusations to "manufacture a case against her son . . . to prevent him from returning [to school] in the fall." *Woods*, 790 So. 2d at 698. According to the plaintiff, these instances included being disciplined for actions he did not do, such as throwing mud at another student; reprimanding him for being disrespectful and disrupting the class, when he had not; intentionally refusing to call on him for answers to questions posed to the class, even though he had his hand up; and not offering prompt medical attention when he fell and scraped his hands. *Id.* at 698-99. In denying the plaintiff's claim, the court noted that the alleged incidents "do not constitute outrageous behavior of a pattern to cumulate into a tort such as intentional infliction of emotional distress." *Id.* at 701-02. Although the legal question in *Woods* is distinguishable from those at issue here, the underlying allegations are substantially similar, and the court's determination is instructive.

Moreover, the plaintiff does not allege any further actions that may have exacerbated the situation to an extreme and outrageous level, such as publicly reprimanding Joshua in front of his class or threatening him with additional abuse of her authoritative power. *See, e.g., Ortiz v. Brookstone Co.*, 274 F. Supp. 2d 456, 466 (S.D.N.Y. 2003) (finding allegations insufficient to sustain intentional infliction of emotional distress claim where plaintiff had not alleged "some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, . . . or conduct contrary to public policy"). The plaintiff does allege that Allen "winked" at Joshua as an acknowledgment of the falsity of her accusation. While this alleged conduct was, at the very least, unprofessional and confrontational, it is insufficient to constitute extreme and outrageous conduct.

While there is no question that a teacher falsely *reporting* misconduct by a student is a reprehensible act, the circumstances of this case are simply not "beyond all possible bounds of decency." Therefore, we cannot conclude that the trial court erred in finding, as a matter of law, that Allen's conduct was not extreme and outrageous, and consequently dismissing the plaintiff's claims.

The plaintiff also argues that the trial court made improper factual determinations regarding the likely event that triggered Joshua's suicide, thereby improperly substituting its judgment for that of a jury. Specifically, in its order granting Allen's motion to dismiss, the trial court stated that it was the desk-tipping incident on the day of his death, rather than Allen's conduct the day before, "that would seem to have been much more likely to have caused [Joshua] to make the decision to take his life." We agree that the trial court's conclusions in this regard would have been improper had it

relied upon them in granting the motion to dismiss. However, the trial court did not do so. Rather, it correctly concluded that Allen's conduct was insufficient as a matter of law to sustain the plaintiff's claims. Therefore, we find no error.

## III

With respect to the second exception, the plaintiff asserts that the trial court erred in dismissing her claims against Moule and SAU #33 because they owed Joshua a general and special duty to prevent his suicide. The existence of a duty in a particular case is a question of law, which we review de novo. *Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 412 (2004). In general, the concept of duty arises out of the relationship between the parties and protection against reasonably foreseeable harm. *Sintros v. Hamon*, 148 N.H. 478, 480 (2002). The existence and extent of that duty depends upon the nature of the relationship between the parties. *Id.*

The plaintiff contends there was a duty owed here based upon Moule's position as the school's guidance counselor and as the person who acted on and reported Joshua's suicide threat. Specifically, the plaintiff contends: "When Moule and her employer decided to retain control and custody of Joshua after learning of the suicide threat, they exercised the requisite level of control and custody over him to create a duty to prevent his suicide" under the second exception. We disagree.

In *Marquay v. Eno*, 139 N.H. 708, 717 (1995), we recognized that "schools share a special relationship with students entrusted to their care, which imposes upon them certain duties of reasonable supervision." In *Marquay*, three students brought a variety of state and federal claims in federal court against the school district, the school administrative unit and employees of their former high school, after allegedly being sexually abused by at least one teacher. *Marquay*, 139 N.H. at 711. The United States District Court for the District of New Hampshire certified several state law questions, one of which asked whether school district employees have a common law duty to protect students whom they know or should know are being sexually abused by another school employee. *Id.* at 712. We answered in the affirmative for those employees who have supervisory responsibility over students because "[s]chool attendance impairs both the ability of students to protect themselves and the ability of their parents to protect them." *Id.* at 717. "It is this impairment of protection from which the special relationship between school and student arises and from which the duty of supervision flows." *Id.* We limited the duty, however, to only those periods of time when parental protection is compromised, and only to those risks that are reasonably foreseeable. *Id.* at 717, 718.

However, we disagree that this special relationship — and the duty of reasonable supervision — extends so far as to create a duty to prevent a student's suicide in this case.

> Fundamental to the second exception [allowing tort liability for the suicide of another] is a pre-existing duty of care and protection imposed on defendants either because they have actual physical custody of, and substantial or total control over, an individual, or because the defendants are specially trained medical or mental health professionals, who have the precise duty and the control necessary to care for the physical and/or mental well-being of a patient.

*Bruzga*, 141 N.H. at 758 (quotations, citation, and brackets omitted).

Here, the plaintiff has not alleged, nor do we find, that the primary purpose of the school, or Moule in her capacity as a guidance counselor, is to "care for" its students, such that this relationship would fall within the purview of this second exception. Further, although a school no doubt possesses some amount of custody and control over its students during school hours, such control is a far cry from that held by jails, juvenile detention facilities or similar institutions where the duty to prevent another's suicide has been imposed. *See McLaughlin*, 123 N.H. at 338. Indeed, "[m]ost jurisdictions are reluctant to impose liability for suicide even upon defendants who had custodial control over the suicidal individual." *Bruzga*, 141 N.H. at 759.

In support of her position, the plaintiff relies upon *Eisel v. Board of Education*, 597 A.2d 447 (Md. 1991). There, the school's guidance counselor heard through other students that the appellant's daughter had stated she intended to commit suicide. *Eisel*, 597 A.2d at 450. The guidance counselor questioned the daughter, who denied making the statements. *Id.* The guidance counselor did not contact the father or the school administration to report the statements. *Id.* at 450. The daughter subsequently died after apparently consummating a murder-suicide pact. *Id.* at 449-50. The court ultimately concluded that the guidance counselor had a duty to warn the father of her suicidal intent. *Id.* at 456. In so holding, the court specifically noted: "The theory of Eisel's case is that he could have exercised his custody and control, as parent, over [his daughter], had he been warned." *Id.* at 451. The circumstances here are plainly distinguishable, as the plaintiff was made aware of Joshua's suicide threat on the day it occurred, and, thus, had the opportunity to exert some control over the situation, unlike the appellant in *Eisel*. Further, while the *Eisel* court found that

there was a duty to warn, it made no further determinations as to a school's potential liability when that duty had been fulfilled, but a suicide still occurred.

 The United States Court of Appeals for the First Circuit has stated: "Absent a showing that the school affirmatively caused a suicide, the primary responsibility for safeguarding children from this danger, as from most others, is that of their parents; and even they, with direct control and intimate knowledge, are often helpless." *Hasenfus v. LaJeunesse*, 175 F.3d 68, 73 (1st Cir. 1999). Indeed, many courts have declined to extend liability to a school for the suicide of a student under a variety of circumstances. *See, e.g., Wyke v. Polk County School Bd.*, 898 F. Supp. 852, 857 (M.D. Fla. 1995), *aff'd in part*, 129 F.3d 560 (11th Cir. 1997) (holding the fact school knew of previous suicide threat did not create special relationship requiring school to prevent student's suicide); *Carrier v. Lake Pend Oreille School Dist. #84*, 134 P.3d 655, 660 (Idaho 2006) (school's statutory duty to warn parents of minor's suicidal tendencies did not extend to passing reference in an essay written seven months earlier); *McMahon v. St. Croix Falls School Dist.*, 596 N.W.2d 875, 882 (Wis. Ct. App. 1999) (even if school had duty to report suicide threat, district could not be held liable for failing to do so because "the suicide is an intervening and superseding cause and is thus too remote from the negligence to render the district liable"). We likewise decline to find a duty under the circumstances of this case.

The plaintiff also argues that Moule acted contrary to the school district's policies for dealing with suicide threats and that her failure to follow these policies may form the basis for liability. However, we need not address this issue, as the plaintiff has merely stated a legal conclusion without specifying either the contents of the alleged policy or how Moule's actions violated it. *See Guglielmo v. WorldCom*, 148 N.H. 309, 312 (2002) (in reviewing a motion to dismiss, we need not accept statements that are merely legal conclusions).

The plaintiff's final argument is that Moule voluntarily assumed a duty to act reasonably to prevent Joshua's suicide when, two months before his suicide, she advised the plaintiff not to remove Joshua from school after his suicide threat, sent him back to class, stated that the threat was a result of a learning disability, and did not advise her to have Joshua examined by an outside professional. The plaintiff asserts that "[t]his series of actions effectively shielded Joshua from the benefit of parental or other professional assistance while . . . [in] school." We disagree.

 We have recognized that a party who does not otherwise have a duty, but who voluntarily renders services for another, may be held to a duty of reasonable care in acting. *Belhumeur v. Zilm*, 157 N.H. 233, 238 (2008).

"The fact that an actor starts to aid another does not necessarily require him to continue his services. An actor may abandon his services at any time . . . unless, by giving the aid, he has put the other in a worse position than he was in before." *Id.* at 239 (quotation omitted). "A person is put in a worse position if the actual danger to him has been increased by the partial performance, or if in reliance he has been induced to forego other opportunities of obtaining assistance." *Id.* (quotation omitted).

Here, the plaintiff has not made any specific allegations in her writ reflecting the specific conduct that she and others would have taken to prevent Joshua's suicide, had Moule taken some further action. Instead, she asks us to infer that, had Moule instructed her to seek professional help, "Joshua would have received an appropriate diagnosis and treatment in time to prevent" his suicide. She further alleges that, "[i]t may also be inferred that, had Moule informed Allen of the suicide threat and otherwise cautioned Allen to use particular care when imposing discipline on Joshua," Allen may not have made the false accusation against Joshua on the day before his suicide. However, when reviewing the grant of a motion to dismiss, we accept only those inferences that are reasonable. *See McNamara*, 157 N.H. at 73. The plaintiff's argument rests upon the assumption that, had Moule taken some further action, a third person may have also taken some further action, which, in turn, may have kept Joshua from making the decision to commit suicide. These inferences are tenuous at best, and are far too speculative for us to find that the risk of Joshua's suicide increased based upon Moule's conduct, or lack thereof. *Cf. Duval v. Wiggin*, 124 N.H. 550, 555 (1984) (finding jury's verdict could not stand when, taking the evidence in the light most favorable to the plaintiff, it was based upon conjecture and not a reasonable inference). We therefore cannot conclude that Moule voluntarily assumed a duty to prevent his suicide.

*Affirmed.*

BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred.